**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **POWER GUARDIAN, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:12-CV-236 (MTT)** |
| | ) | |
| **DIRECTIONAL ENERGY CORP. and** | ) | |
| **FTC ENERGY, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## ORDER

This matter is before the Court on the Defendants' motions to dismiss for lack of

personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). (Docs. 3, 19). For the

reasons discussed below, the motions are **DENIED**.

## I.  BACKGROUND

### A.  The Parties

The Defendants are two companies involved in the sale or manufacture of

generators.

Directional Energy Corp. is a Nevada corporation with its principal place of

business in California. (Doc. 3-3, ¶ 2). Its contacts with Georgia are limited to those

related to the events giving rise to this lawsuit. (Doc. 3-3, ¶ 5). Otherwise, Directional

Energy is not registered to do business in Georgia, has no agent for service of process

in Georgia, does not advertise in Georgia, does not sell or represent any product lines in

Georgia, and none of its officers or agents have traveled to Georgia on business. (Doc.

3-3, ¶¶ 2-6). Directional Energy operates a general website but does not accept orders

through the website.  (Doc. 3-3, ¶¶ 3-4).  The company is a distributor of generators manufactured by FTC Energy, Inc.  (Doc. 3-1 at 1).

FTC Energy is a Florida corporation.  (Doc. 19-2, ¶ 4).  It too has no contacts with Georgia other than those related to the events giving rise to this lawsuit.  (Doc. 19-2, ¶ 9).  FTC Energy does not maintain offices or a place of business in Georgia, has no registered agent in Georgia, does not own property in Georgia, does not pay taxes in Georgia, has never intentionally shipped products to Georgia or solicited business from Georgia, and has never directed advertising toward Georgia.  (Doc. 19-2, ¶¶ 5-8).  FTC Energy manufactured the generators that the Plaintiff purchased from Directional Energy.

The Plaintiff is a Georgia limited liability company.  (Doc. 1-1, ¶ 1).  It purchased two generators from Directional Energy that were manufactured by FTC Energy.

**B. Procedural History**

The Plaintiff filed this lawsuit against Directional Energy in Jones County Superior Court on May 17, 2012, asserting several claims, including breach of contract. (Doc. 1-1).  Directional Energy removed the suit to this Court and simultaneously filed its Motion to Dismiss for lack of personal jurisdiction on June 22, 2012.  (Docs. 1, 3). On July 5, 2012, the Plaintiff amended its Complaint to add FTC Energy as a defendant. (Doc. 6).  On July 27, 2012, Joe Shepard, as chairman/CEO of FTC Energy, filed a pro se motion to dismiss on behalf of the company.  (Doc. 10).  FTC Energy then hired a lawyer, who filed an Amended Motion to Dismiss for lack of personal jurisdiction on September 6, 2012.  (Doc. 19).  The Court struck Shepard's pro se motion from the

record on September 18, 2012, because the law does not permit a pro se filing on behalf of a corporation.[1]  (Doc. 21).

### C. Facts Leading to Litigation

In April 2011, the Plaintiff inquired by email about purchasing two 25 KW generators from Directional Energy that it had viewed on Directional Energy's website. (Doc. 1-1, ¶ 7).  The Plaintiff planned to incorporate the generators into a mobile biomass plant it hoped to market.  (Doc. 1-1, ¶ 12).  In response, Directional Energy representative Allen Staff[2] suggested the parties meet at FTC Energy's location in Florida to discuss the sale and delivery of the generators.  (Doc. 1-1, ¶ 8).  The Plaintiff agreed, and met Allen Staff in Florida along with FTC Energy CEO Joe Shepard.  (Doc. 1-1, ¶ 8).  There, during negotiations, the Defendants offered to upgrade the generators the Plaintiff intended to purchase from 25 KW to 35 KW and replace the plastic casing with metal casing at no additional charge if the Plaintiff would allow more time for delivery.  (Doc. 1-1, ¶ 11).

On May 10, 2011, the Plaintiff by email asked to become a reseller of Directional Energy Corp.'s products.  (Doc. 12-1, ¶ 4).  The next day, Directional Energy emailed a

---

[1] For the purposes of this Order, the Court considered FTC Energy's Amended Motion to Dismiss (Doc. 19), which it filed after retaining legal counsel.

 The Court also provided the Plaintiff additional time to respond to FTC Energy's Amended Motion.  The Plaintiff then submitted a brief that was well over the 20-page limit authorized by the Court's local rules. The Plaintiff has been the worst, but not the only, offender in this regard:  Directional Energy also failed to comply with the Court's rules by submitting a Reply brief (Doc. 12) that exceeded the 10 pages permitted for Reply briefs.  *See* L.R. 7.4.  Given that the Court is not dismissing the Plaintiff's Complaint, counsel for all parties are instructed to review the local rules of this Court and to fully abide by them in future filings.

[2] The Plaintiff alleges Allen Staff was listed as the President of Directional Energy.  In their Declarations, Conrad Staff calls himself the President, while Allen Staff refers to himself as a director of the company.

Reseller's Agreement to the Plaintiff.[3]  (Doc. 1-1, ¶ 13).  The email also included an invoice for two 35 KW FTC Focused Energy Cog Free generators priced at $41,000 each plus a five-year warranty from FTC Energy and a "guarantee of power."  (Doc. 1-1, ¶¶ 14, 64).  On May 13, at Allen Staff's instruction, the Plaintiff sent an $82,000 check overnight by FedEx to Staff's California residence.  (Doc. 1-1, ¶¶ 15-16).  Directional Energy endorsed and cashed the check on May 17.  (Doc. 1-1, ¶ 17).  Upon receiving payment, Directional Energy told the Plaintiff it should now deal directly with FTC Energy.  (Doc. 1-1, ¶ 78).

On July 29, 2011, after FTC Energy notified the Plaintiff that one of the generators was ready, the Plaintiff traveled to Florida to pick it up.  (Doc. 1-1, ¶ 20).  On August 15, having not turned the unit on, the Plaintiff returned it to FTC Energy for modifications, including changing the casing from plastic to metal.  (Doc. 1-1, ¶ 23).  When the Plaintiff retrieved the generator on September 12, the modification had not been made but the Plaintiff nevertheless took the generator back to Georgia to test its power.  (Doc. 1-1, ¶¶ 25-27).  The unit failed to produce sufficient power.  (Doc. 1-1 ¶ 30).  On September 16, FTC Energy CEO Joe Shepard traveled to Georgia to test the generator.  It blew up.  (Doc. 1-1, ¶ 32).  FTC Energy took the unit back to Florida.  (Doc. 1-1, ¶ 33).

---

[3] The Plaintiff has offered the "Resellers Agreement" as evidence at Doc. 8-1.  The Plaintiff alleges Directional Energy required it to sign the agreement as a condition of the sale of the generators.  The agreement lists the parties and their respective addresses but is not signed.  In an affidavit, Conrad Staff disputes the allegation that the agreement was a condition of the sale of the generators.  He also testifies that the parties never signed or entered the reseller's agreement and that the Plaintiff never resold any of Directional Energy's products.  (Doc. 12-1, ¶¶ 3-6).  Therefore, for the purpose of this Order, the Court treats the "Reseller's Agreement" not as a binding contract but as evidence of the depth of negotiations in which the parties engaged.

On September 26, FTC Energy notified the Plaintiff the second generator was ready, and the Plaintiff journeyed to Florida to pick it up.  (Doc. 1-1, ¶¶ 35-36).  The Plaintiff subsequently discovered the second generator was merely the first generator pieced back together.  (Doc. 1-1, ¶ 37).  The Plaintiff notified Directional Energy, who advised the Plaintiff to remove the casing and verify it was the same generator.  (Doc. 1-1, ¶ 39).  The Plaintiff did so, and on September 27, contacted Directional Energy and requested a full refund.  (Doc. 1-1, ¶ 42).  Directional Energy responded that it still intended to produce two generators as promised.  (Doc. 1-1, ¶ 43).

The Plaintiff then engaged in a series of emails with FTC Energy regarding the refund request, condition of the generators, and promised performance.  (Doc. 1-1, ¶¶ 44-55).  Based on these communications, the Plaintiff perceived FTC Energy to be speaking for both itself and on behalf of Directional Energy.  (Doc. 1-1, ¶ 54).  On December 28, 2011, the Plaintiff emailed Directional Energy about the status of the new generators.  Directional Energy did not respond.  (Doc. 1-1, ¶ 56).  Having never obtained a working generator – but remaining in possession of the generator that blew up – the Plaintiff sent letters to both Defendants on February 7, 2012, again seeking a refund.  Only FTC Energy responded, but not in a manner the Plaintiff found favorable. (Doc. 1-1, ¶¶ 57-58, 70).  The Plaintiff then filed this lawsuit.

## II.  DISCUSSION

### A.  Burden of Proof

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  *Diamond Crystal Brands, Inc. v. Food Movers*

*Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010).  "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'"  *Id.*  "'Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.'"  *Id.*

### B. *Diamond Crystal* Jurisdictional Analysis

The Plaintiff contends this Court has personal jurisdiction over both Defendants pursuant to Georgia's long-arm statute, O.C.G.A. § 9-10-91, and the Due Process Clause of the Fourteenth Amendment.  *Diamond Crystal* governs the analysis of these issues.[4]

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the

---

[4] The Plaintiff disregards *Diamond Crystal* entirely and rests its argument on outdated authority.  As a result, the Plaintiff conflates the long-arm statute and due process clause of the Fourteenth Amendment, arguing jurisdiction may be exercised over non-residents to the maximum extent permitted by the Constitution.  *See, e.g.*, Doc. 22 at 5.  The Plaintiff's analysis is wrong because it does not comply with Eleventh Circuit precedent.

   Still, the Court acknowledges the apparent tension between *Diamond Crystal* and Georgia courts' interpretation of the Georgia long-arm statute following *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames*, 279 Ga. 672, 620 S.E.2d 352 (2005).  According to *Diamond Crystal*, *Innovative Clinical* holds that O.C.G.A. § 9-10-91(1) is not coextensive with due process limitations and must be analyzed independently therefrom.  Yet state courts do not appear to read *Innovative Clinical* the same way.  *See, e.g.*, *Vibratech, Inc. v. Frost*, 291 Ga. App. 133, 137, 661 S.E.2d 185, 188 (2008) (citing *Innovative Clinical* for the proposition that "the language of O.C.G.A. § 9-10-91(1) must be construed as reaching 'to the maximum extent permitted by procedural due process'").  Moreover, prior to *Diamond Crystal* at least one federal district court read *Innovative Clinical* to extend § 9-10-91(1) to the limits of the Due Process Clause.  *See, e.g.*, *Global Payments Direct, Inc. v. Am. Bank of Commerce*, 2006 WL 269967 at *2 n.2 (N.D. Ga.).

Fourteenth Amendment to the United States Constitution." *Diamond Crystal*, 593 F.3d at 1257-58. This two-step inquiry is necessary because the long-arm statute does not provide jurisdiction to federal courts in Georgia that is coextensive with procedural due process. Rather, the statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Diamond Crystal*, 593 F.3d at 1259. In short, jurisdiction that might appear to be conferred by statute may be negated by due process concerns, and vice versa. *See id.* at 1261.

In this case, the Plaintiff relies on the first subparagraph of the Georgia long-arm statute:

> A court of this state may exercise personal jurisdiction over any
> nonresident … in the same manner as if he were a resident of the state,
> if in person or through an agent, he:
> (1) Transacts any business within this state…

O.C.G.A. § 9-10-91(1). *Diamond Crystal* instructs federal courts to interpret Georgia's long-arm statute literally. *Id.* at 1264. Thus, to satisfy the "transacts any business" requirement, the defendant must have "'purposefully done some act or consummated some transaction in [Georgia].'" *Id.* (quoting *Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 517, 631 S.E.2d 734, 737 (2006)). Significantly, "a defendant need not physically enter the state" to subject himself to the long-arm statute. *Id.* And courts may further consider the nonresident's mail, telephone calls, and other intangible acts that occur while the defendant is outside of Georgia. *Id.* The question is whether, upon analysis of all the defendant's tangible and intangible conduct, "it can fairly be said that

the nonresident [defendant] has transacted *any* business within Georgia." *Id.* (emphasis added).[5]

However, for the Court to exercise jurisdiction over nonresident defendants, it is not enough that the long-arm statute is satisfied.  Personal jurisdiction must also adhere to the Due Process Clause of the Fourteenth Amendment.  "The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments of a forum with which he has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-72, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985).  "The heart of this protection is fair warning – the Due Process Clause requires 'that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there.'" *Diamond Crystal*, 593 F.3d at 1267 (quoting *Burger King*, 471 U.S. at 474).  "Therefore, states may exercise jurisdiction over only those who have established 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Id.*  (quoting *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

### C. Jurisdiction over Directional Energy Corp.

#### (1) The Long-Arm Statute

Georgia's long-arm statute plainly provides personal jurisdiction over Directional Energy because Directional Energy transacted at least some business in the state.  Specifically, Directional Energy entered into a contractual relationship with a Georgia

---

[5] The *Diamond Crystal* court adopts a literal definition of the words in the statute, such that "any" means "to any extent" or "in any degree." *Id.* at 1265 n.18.

company.  Its representatives participated in face-to-face negotiations in Florida for the

sale of two 35 KW Focused Energy Cog Free Generators to the Plaintiff in Georgia.

(Doc. 1-1, ¶¶ 8-12).  Directional Energy subsequently emailed to the Plaintiff in Georgia

an invoice for the generators, priced at $41,000 each, for a total of $82,000, along with

a Reseller's Agreement, a five-year limited warranty from Defendant FTC Energy, and a

power output guarantee, according to the Plaintiff.  (Doc. 1-1, ¶¶ 13-14, 63-65).  In

return for its promise to sell two generators, Directional Energy derived revenue from

Georgia when, on Directional Energy's instructions, the Plaintiff sent by FedEx to

Directional Energy in California a check for $82,000.  (Doc. 1-1, ¶¶ 15-16).

Thus, Directional Energy "purposefully … consummated some transaction" in

Georgia by intentionally selling generators to a specific Georgia company.  Even if its

agents did not physically enter the state, Directional Energy exchanged electronic and

personal communications with a Georgia company, engaged in face-to-face contract

negotiations with a Georgia company, and accepted payment from a Georgia company,

all in furtherance of executing a transaction in Georgia.  It can fairly be said that this

conduct constitutes the transaction of "any business."  Directional Energy suggests that

these actions are less extensive than the contacts that amounted to "any business" in

*Diamond Crystal* – which examined two purchase orders sent by a California buyer to a

Georgia manufacturer, requesting delivery in Georgia – and are insufficient under the

statute.  But *Diamond Crystal* does not hold that its facts create the floor below which

the statute shall not apply.  Moreover, when hewing closely to the plain meaning of the

statute, the Court cannot ignore the fact that there was, to some degree, business

transacted here.  *See Thomas v. Strange Engineering, Inc.*, 2012 WL 993244 at *5

-9-

(S.D. Ga. 2012) (applying literal interpretation of the long-arm statute and holding that "any business" was transacted when defendant shipped a product to Georgia and derived revenue from the sale of that product).

Consequently, Directional Energy's conduct satisfies the "transacts any business" requirements of Georgia's long-arm statute.

### (2) Due Process

Whether Directional Energy has sufficient contacts with the forum to satisfy Constitutional jurisdictional requirements is a closer call.  Two types of personal jurisdiction exist: general and specific.  General jurisdiction arises when the defendant's contacts with the state "are unrelated to the cause of action being litigated."  *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000).  General jurisdiction further requires that there be "continuous and systematic general business contacts between the state and the foreign corporation."  *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786 F.2d 1055, 1057 (11th Cir. 1986).  Here, general jurisdiction does not exist.  Directional Energy does not target the Georgia market generally, does not sell or represent any product lines in Georgia, does not advertise in Georgia, and has no officers or agents that have ever traveled to Georgia.  (Doc. 3-3, ¶¶ 5-8).  Further, the Plaintiff has not alleged facts to suggest that general jurisdiction exists.

This narrows the question to whether Directional Energy is subject to specific personal jurisdiction.  Meeting specific jurisdiction requirements is less onerous:  "[T]he fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum … and the litigation results from alleged injuries that arise out of or relate to those activities."  *Diamond Crystal*, 593 F.3d at 1267.  "Put

differently, the defendant must have 'purposefully availed' itself of the privilege of conducting activities – that is, purposefully establishing contacts – in the forum state and there must be a sufficient nexus between those contacts and the litigation. *Id.* The Supreme Court has further made clear that "so long as [a defendant] creates a substantial connection with the forum, even a single act can support jurisdiction." *Licciardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir. 2008) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).  For example, "[i]ntentional torts are such acts, and may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with forum." *Id.*  It is true that the mere existence of a contract does not *alone* automatically establish the requisite minimum contacts. *Burger King*, 471 U.S. at 478.  But this is not a rule to be applied mechanically. *Id.*  Rather, a "highly realistic" review is required that looks at the transaction holistically – its prior negotiations, contemplated future consequences, contractual terms, and actual course of dealing – to evaluate the defendant's purposeful contact with the forum. *Id.* at 479.

Here, Directional Energy's only known contact with Georgia was through the transaction that gave rise to this litigation.  Nevertheless, through the nature and quality of this transaction-related contact, Directional Energy purposefully established minimum contacts with Georgia.  Although the Plaintiff made the initial inquiry, it was Directional Energy that "reached out beyond" California and Nevada to negotiate in person with a Georgia company for the sale of two generators. *See Burger King*, 471 U.S. at 479.  This was not the mere exchange of boilerplate forms.  A Directional Energy director traveled across the country to meet with the Plaintiff in Florida to discuss the deal in detail.  That Directional Energy would suggest a face-to-face meeting at a location

-11-

several thousand miles from its principal place of business – purely for the purpose of selling its generators to the Plaintiff – reveals the deliberateness with which it sought to contact Georgia.  The purposefulness of its actions is further evidenced by Directional Energy's offer to upgrade the units beyond the Plaintiff's initial request.  It seems clear that by offering these modifications, Directional Energy hoped either to induce the Plaintiff's purchase, to meet the specific demands of the Georgia market as articulated by the Plaintiff, or both.  Eventually, Directional Energy's efforts enabled it to extract $82,000 from Georgia through its sale to the Plaintiff.  And after being paid, Directional Energy continued its contacts with Georgia through email communications with the Plaintiff regarding performance of the contract.

Moreover, the parties here also contemplated a longer term relationship whereby the Plaintiff would become a reseller of generators it purchased from Directional Energy. (Doc. 8-1).  The terms of this agreement purported to give the Plaintiff the right to sell Directional Energy generators in all states east of the Mississippi River.  (Doc. 8-1 at 2, 10).  In exchange, the Plaintiff would be required to purchase hundreds of thousands of dollars in equipment from Directional Energy each year.  (Doc. 8-1 at 2, 10-12).   Even if this agreement was never signed, and even if the Plaintiff never actually resold any Directional Energy products, the fact that Directional Energy sought such an arrangement with the Plaintiff shows that at least until the generators were paid for, Directional Energy contemplated a "substantial and continuing relationship" with the Plaintiff in Georgia.  *See Burger King*, 471 U.S. at 487.

Although Directional Energy in its briefs did not cite *Banton Industries, Inc. v. Dimatic Die & Tool Co.*, 801 F.2d 1283 (11th Cir. 1986), the Court recognizes that case

might initially appear to support Directional Energy's argument.  However, *Banton's* facts are distinguishable.  In *Banton*, an Alabama plaintiff placed an unsolicited order for the purchase of more than 2,400 pulleys from a Nebraska defendant.  The defendant responded by shipping the pulleys, tendering them in Nebraska.  801 F.2d at 1284.  On these bare facts, the Eleventh Circuit held this did not provide minimum contacts with Alabama.  *Id. Diamond Crystal* has since recognized the narrowness of Banton's application:  "Other than merely accepting the order from the Alabama plaintiff, the transaction in *Banton* involved literally no contact with the proposed Alabama forum." *Diamond Crystal*, 593 F.3d at 1271 (internal citation removed).  In this case, the depth of negotiations that ensued between Directional Energy and the Plaintiff following the Plaintiff's initial inquiry exceeds the nature and quality of the "contacts" created by the automatic shipments in *Banton*.  This was not a transaction accomplished by the mere exchange of boilerplate forms.  Moreover, unlike *Banton's* fungible pulleys, during negotiations here Directional Energy sought to have a product constructed that was suitable to the Plaintiff's specific needs in Georgia.

It simply cannot be said, given the discussion prior to and surrounding the sale of the generators to the Plaintiff, that Directional Energy's contacts with Georgia were so cursory as to be random, fortuitous, or attenuated.  Directional Energy intentionally and deliberately engaged the forum over a period of time for the purpose of entering a contractual relationship that would secure a sale here.  The Eleventh Circuit has found contract-related behavior that is less substantial than this to create minimum contacts. *See Cronin v. Washington Nat'l Ins. Co.*, 980 F.2d 663, 670 (11th Cir. 1993) (holding that Massachusetts insurance broker's oral offer to obtain insurance for a Florida

resident was sufficient contact to subject him to personal jurisdiction in Florida);

*Brennan v. Roman Catholic Diocese of Syracuse New York, Inc.*, 322 Fed. Appx. 852,

856 (11th Cir. 2009) (holding that New York bishop's oral offer to pay for Florida

resident's counseling sessions created sufficient minimum contacts to subject diocese

to personal jurisdiction in Florida).

Beyond entering into a contractual relationship with a Georgia company,

Directional Energy deliberately introduced a defective product to the forum by selling

faulty generators to the Plaintiff.  (Doc. 1-1, ¶ 81).  Importantly, a federal court "does not

exceed its powers under the Due Process Clause if it asserts personal jurisdiction over

a corporation that delivers its products into the stream of commerce with the expectation

that they will be purchased by consumers in the forum [s]tate." *World-Wide Volkswagen*

*Corp. v. Woodson*, 444 U.S. 286, 297-98 (1980). *World-Wide Volkswagen*

distinguishes between situations where a defendant's product finds its way into the

forum state by chance and situations where the defendant's effort to directly or indirectly

serve the forum market lead to the product's sale there.  444 U.S. at 297.  Here,

Directional Energy purposefully directed its activities toward Georgia by selling

generators directly to the Plaintiff, a Georgia resident.  Directional Energy knew its

products were being purchased by a Georgia consumer based on its direct negotiations

with the Plaintiff.  Even if Directional Energy did not literally deliver the generators to

Georgia, Georgia was their obvious destination.  Consequently, Directional Energy's

contact with Georgia was not random or fortuitous but intentional and deliberate.  By

selling directly to a Georgia consumer, Directional Energy  "purposefully avail[ed] itself

of the privilege of conducting activities" in Georgia.  *World-Wide Volkswagen*, 444 U.S.

at 297.

Further support for this Court's exercise of personal jurisdiction over Directional

Energy is found in *Austin v. North American Forest Products*, 656 F.2d 1076 (5th Cir.

Unit A Sept. 1981).[6]  In *Austin*, a nonresident defendant door manufacturer contested

personal jurisdiction in Louisiana, where its doors were ultimately installed.  It argued its

contacts were insufficient under the following facts: the plaintiff had submitted purchase

orders for doors from his office in Oregon to the defendant's office in Michigan; the

defendant shipped the doors to Alabama; and the defendant never sent a

representative to Louisiana to inspect the doors once they were installed there.  656

F.2d at 1090.  The former Fifth Circuit, however, found these contacts on their own were

enough to confer jurisdiction because there was evidence the defendant "had absolute

knowledge" the doors would eventually be purchased by a Louisiana consumer.  *Id.* at

1091.  That is the case here:  By entering direct negotiations with the Plaintiff, a Georgia

company, in the manner that it did, Directional Energy absolutely knew to whom and to

where it was selling generators.  *See also Rogers v. Omni Solution, Inc.*, 2010 WL

4136145 (S.D. Fla.) (applying *Austin* and finding minimum contacts where nonresident

defendant negotiated sale of defective exhaust system to Florida plaintiff).

Finally, the Plaintiff alleges that Directional Energy accomplished this sale

through intentionally tortious conduct – fraud.  (Doc. 1-1, ¶¶ 72-87; ¶¶ 118-138).

Specifically, the Plaintiff alleges that Directional Energy intentionally misrepresented its

ability to deliver working FTC generators as described on its website and in subsequent

---

[6] The Eleventh Circuit has adopted as binding all decisions of the former Fifth Circuit rendered
prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

negotiations with the Plaintiff.  Directional Energy has not by affidavit or other such

evidence disputed these particular claims.  If the Plaintiff's allegations of fraud are taken

as true, then Directional Energy expressly aimed its tortious statements at the Plaintiff in

Georgia when, while in Florida, it promised the Plaintiff to sell it a product that it knew

could not be delivered.  These statements, according to the Plaintiff, ultimately resulted

in the Plaintiff's injury in Georgia.  Based on the intentionally tortious conduct alleged,

Directional Energy had fair warning that it could be haled into court here.  *See*

*Licciardello*, 544 F.3d at 1288.

Having established Directional Energy's minimum contacts with Georgia, the final

issue to address is the "fairness" of exercising jurisdiction over the corporation.

Directional Energy argues that "fair play and substantial justice" would not be served

when measured against *Burger King*'s fairness factors: (1) the burden on the defendant;

(2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in

obtaining convenient and effective relief; (4) the interstate judicial system's interest in

obtaining the most efficient resolution of controversies; and (5) the shared interest of the

several states in furthering fundamental substantive social policies.  471 U.S. at 477.

But Directional Energy "must present a compelling case" that the presence of

other considerations would render jurisdiction unreasonable, and it has not done so.  *Id.*

Directional Energy primarily cites the burden of traveling from California to Georgia to

defend against this lawsuit, which it finds at odds with the state's interest in adjudicating

the dispute.  However, Georgia has a manifest interest in providing its residents a

means of redress, and this interest justifies the imposition of "serious burdens" on

nonresident defendants.  *Diamond Crystal*, 593 F.3d at 1274.  While Directional Energy

may incur travel costs to contest this lawsuit, these costs are not so large as to preclude a Georgia company from bringing suit in Georgia for the injuries alleged here.  Further, the Court notes that Directional Energy has already shown its ability and willingness to travel cross-country by its prior journey to Florida in furtherance of making the sale that gave rise to this litigation.  Therefore, it is fair to subject Directional Energy to the jurisdiction of this Court.

Consequently, the Court exercises personal jurisdiction over Directional Energy pursuant to Georgia's long-arm statute and the Due Process Clause of the Fourteenth Amendment.  For these reasons, Directional Energy's Motion to Dismiss (Doc. 3) for lack of personal jurisdiction is **DENIED**.

### D.  Jurisdiction over FTC Energy, Inc.

### (1) The Long-Arm Statute

For many of the same reasons discussed above, Georgia's long-arm statute plainly applies to FTC Energy.  As the manufacturer of generators the Plaintiff sought to purchase, FTC Energy was integral to the sale that Directional Energy executed.  FTC Energy transacted business in Georgia by manufacturing generators specifically for a Georgia company.  This manufacture, and activity appurtenant thereto, was the "purposefully done…act or…transaction" that the statute contemplates. *Diamond Crystal*, 593 F.3d at 1264.  That the generators were literally assembled outside of the state does not matter because they were created purely for the purpose of sale to a Georgia company.  Again, "a defendant need not physically enter the state" to transact business in Georgia. *Id.*

-17-

FTC Energy also engaged in additional transactional conduct in Georgia through its communications with Plaintiff:  It took part in face-to-face negotiations with the Plaintiff in Florida prior to the Plaintiff's purchase, it subsequently communicated by email or telephone with the Plaintiff in Georgia regarding a pick up date for the first generator, and it later traveled to Georgia to test the unit for sufficient power.  (Doc. 1-1, ¶¶ 20, 32).  Finally, FTC Energy engaged in a series of electronic communications with the Plaintiff regarding the performance of the first generator, the manufacture of the second generator, and the Plaintiff's request for a refund.  (Doc. 1-1, ¶¶ 44-55).  These communications all had the goal of fully consummating the sale of the generators in Georgia or meeting FTC Energy's obligations to the Georgia Plaintiff.  Given this combination of tangible and intangible conduct, "it can fairly be said that the nonresident [defendant] has transacted…business within Georgia."  *Diamond Crystal*, 593 F.3d at 1264.

### (2) Due Process

As with the long-arm statute application, FTC Energy's minimum contacts with Georgia parallel those of Directional Energy.  Perhaps most notable is the fact that FTC Energy deliberately manufactured a product knowing that it was being purchased by a Georgia company.  That the generators were built in Florida, and that the Plaintiff traveled there to pick them up, does not negate FTC Energy's absolute knowledge that it was manufacturing the units for a Georgia customer.  The generators at issue were not pulled off an assembly line and blindly dumped into the stream of commerce to be carried to an unknown destination.  They were manufactured and designed specifically for sale to the Plaintiff in Georgia.  The additional contacts that FTC Energy made with

the state – through its communications with the Plaintiff and its trip to inspect the generator – only underscore the intentionality and deliberateness with which FTC Energy directed its conduct toward Georgia.  Thus, FTC Energy purposefully availed itself of the Georgia market and subjected itself to the jurisdiction of Georgia courts for litigation arising out of its conduct.

Additionally, jurisdiction over FTC Energy in Georgia is fair for the same reasons that applied to Directional Energy.  Given the state's manifest interest in providing its residents a means of redress, FTC Energy has not stated any serious burden it would face that would make jurisdiction so unreasonable as to overcome this interest. Obviously, if it is reasonable for Directional Energy to travel to Georgia from the west coast to defend its case, it is even more reasonable to expect FTC Energy to litigate its case when traveling from Florida.

Consequently, the Court exercises personal jurisdiction over FTC Energy pursuant to Georgia's long-arm statute and the Due Process Clause of the Fourteenth Amendment.  For these reasons, FTC Energy's Motion to Dismiss (Doc. 19) for lack of personal jurisdiction is **DENIED**.

## III. CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss for lack of personal jurisdiction (Docs. 3, 19) are **DENIED**.

**SO ORDERED**, this 17th day of October, 2012.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

-19-